[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for the dissolution of a marriage. The plaintiff and the defendant were married on January 25, 1970 in Mamaroneck, New York. Both parties have lived continuously in this state for at least twelve months next preceding the date of filing of the complaint. The parties have had two children issue of their marriage, Allison, now age 20, and Jonathan, still a minor, now age 16. The marriage of the parties has broken down irretrievably.
The parties first met approximately thirty years ago. The plaintiff was attending New York University, from which he ultimately graduated in 1969, and was also working part-time at the family business, Basior-Schwartz Meat Products, Inc. CT Page 5256-MM (hereinafter "Basior-Schwartz"), located in Manhattan. The defendant had finished high school and had full time employment doing clerical and secretarial work. They commenced a courtship of several years, following which the parties were married, as indicated, in 1970.
The plaintiff had the good fortune to be raised in a family with considerable financial substance. Also, his family accumulated and invested on his behalf generous monetary gifts from sources such as his bar mitzvah, and the like. The plaintiff, too, was industrious as a youth and through his college years, and accumulated some earnings. At the time of the marriage, the plaintiff had available to him the sum of approximately $200,000 to $250,000, as a result of these investments and earnings.
The defendant had a more modest financial background. Following high school, she became employed to support herself and to contribute to the financial well being of her father and mother, with whom she lived until her marriage to the plaintiff. Her savings were understandably more meager, and she entered the marriage with approximately $5,000.
Following the marriage, the plaintiff continued in the employ of Basior-Schwartz, commuting from the parties' rented apartment in Port Chester. His work hours were extensive and somewhat atypical. The nature of the business required that it would be open and running in the early morning hours. Thus, the plaintiff usually arrived at work in the very early morning hours, and returned home in the mid or late afternoon. The defendant continued her job after the marriage, as well. All of the defendant's earnings were also used for common expenses.
The parties then bought a home in the Riverside section of Greenwich in 1972 for approximately $60,000. This was funded by a gift from the plaintiff's parents of $10,000, a loan from them for another $10,000, monies contributed by the plaintiff of $35,000, and by the defendant of $5,000. The plaintiff testified that the defendant later demanded reimbursement of this sum, but the court rejects that testimony as not credible. The plaintiff continued working for Basior-Schwartz and, after a time, the defendant was able to find a clerical job locally.
Some time after this move, the parties began contemplating having a child. The impetus for this sprung more from the CT Page 5256-NN defendant. The plaintiff was reluctant, believing that a child would interfere with the parties' jobs, and would be too costly. However, the defendant eventually won the plaintiff over on this issue.
The plaintiff then felt another move was necessary, citing the impending arrival of their first born and the desirability of raising a child in a more refined neighborhood, as well as relocating to a quieter neighborhood. The plaintiff believed more quiet was necessary because he retired very early for work. The defendant did not want the move, preferring the close knit, family atmosphere of the Riverside neighborhood. Regardless, the plaintiff found a sizable undeveloped parcel in North Greenwich, and built a home on it to virtually coincide with the arrival of the parties' first born, Allison. The location and design of the home were not the defendant's preference. To some extent, legitimate budgetary concerns were a limiting factor in the location and design. However, of equal prominence was the plaintiff simply doing things as he, only, saw fit.
The land and home on Old Mill Road, in Greenwich, were bought and constructed in 1976 on the following basis. The Riverside home was sold for $103,000. The land cost for the new residence was $53,000. Construction and related costs totalled $113,900. The difference between the net sales price of the former home and the acquisition and construction cost for the new home, was funded primarily by the plaintiff's earnings and savings. Other improvements added later, including a pool, were an additional $14,500. Unlike their first home, title to this one was taken in the plaintiff's name only. The defendant was unaware of this. The home remained the common marital residence until April, 1994, when the parties separated.
The birth of Allison occurred in July, 1976. Despite his initial misgivings concerning child rearing, the plaintiff generally warmed to the task of fatherhood. However, his work remained his highest priority. The defendant, too, was a good parent. She left her job to stay home, run the household, cook and clean, and was the primary caretaker for Allison. Both parties were good parents, and the marriage through this time was generally happy.
Several years went by somewhat uneventfully. The defendant then believed that the family would be more complete, and in ensuing years it would be happier for Allison, if the defendant CT Page 5256-OO could have a second child. The plaintiff, much more so than before, felt and said otherwise. He cited the same factors as before in opposition. The defendant again prevailed but not without a purported cost. The plaintiff caused an "agreement" to be prepared. Its essence was that, in consideration for the plaintiff's acquiescence in having a second child, the defendant would never request a third child and she would relinquish her claim to most of the plaintiff's assets in any future divorce proceeding. The plaintiff has not asked this court to give effect to this agreement. He has offered it to show what was required by way of "assurances", and to mute the defendant's alleged threats to leave him with Allison in tow. The court believes that the plaintiff negotiated the birth of the second child. This is illustrative of the extremes to which the plaintiff was prepared to go to impose his own wishes on the defendant.
The defendant was now free to conceive, and she gave birth to a son, Jonathan, in February, 1980. It is at this juncture that each party's evidence begins to diverge dramatically concerning the spousal and parental unfitness of the other.
The devotion and diligence of the plaintiff to his work at Basior-Schwartz is readily apparent and is not seriously disputed. The plaintiff achieved years of generous income from the business. The plaintiff's average salary and bonus from Basior-Schwartz between 1986 and 1991, the plaintiff's last full year in the business, was $123,700, gross. His peak year was in 1988, when he grossed $196,100. The plaintiff was a good provider. Yet, this came at a high cost to the family. The plaintiff was not able to participate in raising Jonathan on a daily basis as he had Allison. The defendant was left to care for the two young children, though that eased somewhat when the family found a reliable sitter who cared for the children in her own home. The plaintiff's nocturnal work hours wreaked havoc with any real semblance of a weekday family life. The defendant knew going into the marriage the nature of the plaintiff's work and his business, but probably failed to assess their full impact. Since the plaintiff needed to retire early, he insisted the home be kept quiet. This was a nearly impossible request with the young children. There was undeniable tension in the home.
The defendant was not blameless. She frequently swore at and used invectives with the plaintiff, and as the children grew older, with them as well. Despite the outside assistance she received, the defendant did not carry the burdens of motherhood CT Page 5256-PP particularly easily. Also, the plaintiff was always extremely frugal in his spending habits, sometime to the point of being pecunious. In contrast, the defendant did not always spend in moderation. She enjoyed extravagances. This was a source of friction between the plaintiff and the defendant.
The stress on the marriage did not recede as the children aged; it intensified. Jonathan was a more troublesome and problematic child than Allison. He frequently "acted out". Now, at age 16, he is in a very structured state sponsored residential school in Cromwell. He is expected to remain there approximately another year[1]. It appears that the defendant was more attentive and sympathetic to Jonathan's special needs than was the plaintiff. Allison appears to have grown closer to her father; she and her mother are, unfortunately, virtually estranged. Allison, now 20 and a student at the University of Connecticut, has not been welcomed in her mother's household since the summer of 1995. The court believes that the parents do have affection for both of their children, but they have found it difficult to nurture their relationship with each child given the stresses on the marriage and this pending divorce proceeding.
The strain on the marriage grew more acute in 1988, when the plaintiff and his brother bought out the interest of the plaintiff's father and uncle in Basior-Schwartz. The plaintiff's long hours became longer; family vacations were essentially non-existent. The business then began to fail.[2] The plaintiff, rather than invest personal capital in Basior-Schwartz and place it at risk, attempted to sell the business. There were no ready buyers, and creditors forced the business into involuntary bankruptcy in late 1992. There is also an adversary proceeding in the bankruptcy against the plaintiff and his brother, personally. All of these have had a deleterious effect on the marriage.
After the failure of Basior-Schwartz the plaintiff collected unemployment compensation benefits in New York State. He has not elected to find other work, and has proclaimed a permanent retirement. The plaintiff does not feel that he has the need to work, because of the size and nature of the investment portfolio he has amassed. It is now nearly $2,000,000,[3] and generates substantial tax free interest and dividends. Based upon the plaintiff's financial affidavit filed at the time of trial, the portfolio generates approximately $120,000 yearly tax free.
The plaintiff claims that he has achieved this by careful CT Page 5256-QQ nurturing and contributions to the $225,000 to $250,000 he received in approximately 1970 (p. 2, infra). The plaintiff testified, in essence, that he has consistently reinvested the proceeds of his portfolio, made up primarily of tax free bonds, and has saved and invested portions of his earnings (an average of $7,500 per year from 1977 to 1985 alone), by living modestly within his means, even in years when his income would have allowed some leisure and extravagance. This allowed the plaintiff to build the marital residence and purchase other assets on a cash basis, free of debts and encumbrances. The residence alone has a present fair market value of approximately $850,000. Its tax basis is approximately $242,000. The defendant spent much time at trial to attempt to show (1) that the plaintiff did not enter the marriage with anything near the sum he claims, and (2)
the plaintiff received monies from Basior-Schwartz in excess of that reported on his tax returns. The plaintiff's practice of receiving and handling his salary in cash, to the extent he did, admittedly lends itself to these speculations. Also, the plaintiff's lack of complete candor (p. 4, infra, as an example) and questionable financial practices[4] does not assist him. Also, the plaintiff could be very secretive and evasive with the defendant about his financial affairs. However, the defendant has fallen short of persuading the court that the plaintiff's current portfolio was the product of events others than as testified to by the plaintiff.
The plaintiff spent the first years of his retirement "winding down", by tending his investments, doing volunteer work, and engaging in writing "therapy." He also, not unnaturally, spent more time at home. Any hope that the marriage could recover under these new circumstances, did not last long. There was infrequent intimacy. The parties were no longer compatible and the plaintiff moved out in April, 1994. The defendant did earnestly attempt reconciliation, but the die had been cast and the plaintiff refused. Mediation efforts failed. The bedrock of this marriage began to crumble many years ago for the reasons indicated. Each party pointed to relationships the other has developed since the separation but these relationships were clearly not the cause of the breakdown. In sum, this court declines to assess fault wholly against either party, believing instead that they both share significantly in the breakdown of the marriage.
Finally, the court addresses the matters of the parties' health, their vocations, skills and future employability. The CT Page 5256-RR plaintiff is 48 years old and in good health. The defendant is 49 years old and has an assortment of medical symptoms and conditions. The plaintiff was not understanding in this respect, and begrudged the defendant's health expenses. The more serious conditions include ulcerative colitis and iritis. The defendant also has substantially greater anxiety regarding the effect of the breakup on her future, than does the plaintiff. The defendant has managed these conditions with medical care and treatment, and with therapy. Some of these conditions will require future treatment and expenses. The court does not believe any of these conditions will substantially debilitate the defendant.
The plaintiff has been in the working world full time, all of his adult life, until recently. Though he has chosen not to work again, he is educated, experienced, and has the capacity to be gainfully employed. He also has considerable financial and business acumen. By contrast, the defendant has fewer vocational skills. Her work experience has been limited to clerical and secretarial work before and in the early years of her marriage, and sporadic part-time retail sales work in the years since her children began school. She has never earned more than $10 per hour. Though she hopes to acquire some computer skills and find work, it is doubtful that she can earn more than $20,000 to $30,000 per year full time. She does not have comparable financial skills to the plaintiff's. This court has carefully considered all of the evidence and the statutory criteria, and enters the following orders:
1. A decree of dissolution shall enter on the grounds of an irretrievable breakdown.
2. The defendant shall have sole and exclusive possession of the former marital residence at 69 Old Mill Road, in Greenwich, until such home is sold as set forth herein. The home shall be listed for sale within eighteen months hereof, and sold within two years hereof, unless the defendant elects a sooner listing and sale. The listing and sale shall be at prices mutually agreed upon by the parties. If the plaintiff and defendant fail to agree to listing or sale prices, they shall designate a mutually acceptable broker in the town of Greenwich to make said decisions, which decisions shall be binding. During the defendant's possession of the premises, she shall be responsible for the real estate taxes, property insurance, utilities and any expense for the care and maintenance of the property not exceeding $500. The portion of any expense exceeding $500 shall CT Page 5256-SS be borne sixty percent to the plaintiff and forty percent to the defendant. From the gross sale price shall be paid the broker's commission, attorney's fees, conveyance taxes and the usual and customary closing costs, and the net proceeds of the sale shall be divided sixty percent to the plaintiff and forty percent to the defendant. Each party shall be responsible for any capital gains tax in this proportionate share. The court reserves jurisdiction as to all matters concerning this property.
3. The Merrill Lynch account and USAA Fund (Plaintiff's affidavit) shall be divided equally between the parties. The distribution shall be, to the extent possible, an "in kind" division of the securities, bonds or other components thereof, with any difference to be accomplished by a cash adjustment to the party receiving the lesser portion of the "in kind" division. The court reserves jurisdiction to accomplish this "in kind" division, and any necessary cash adjustment.
4. The plaintiff shall assign to the defendant a 35% interest in the Merrill Lynch retirement account (Plaintiff's affidavit) by means of a qualified domestic relations order.
5. The plaintiff shall retain the New York life annuity (Plaintiff's affidavit); the defendant shall retain the IRA and People's Bank certificates of deposit in her name (Defendant's affidavit).
6. The plaintiff shall retain the ownership and his interest in the Metropolitan Life insurance policy (Plaintiff's affidavit).
7. The plaintiff shall retain the ownership and his interest in the People's Bank savings account and First Fidelity checking account (Plaintiff's affidavit); the defendant shall retain her ownership and interest in her People's Bank checking account and cash on hand (Defendant's affidavit).
8. The plaintiff shall own and retain the silver bars (Plaintiff's affidavit) and his interest in the condominium security deposit (Plaintiff's affidavit).
9. The defendant shall retain her clothing and jewelry (Defendant's affidavit).
10. The plaintiff shall retain the Lexus and Honda CT Page 5256-TT automobiles; the plaintiff shall assign ownership of the Mercedes automobile to the defendant (Plaintiff's affidavit). All household furniture in the present marital residence shall be divided equally by the parties. In the event that the parties cannot agree on this division, the parties shall each submit an inventory of all household furnishings within thirty days hereof to the Family Relations Office which shall prepare a recommendation to this court, and the decision of this court shall be final.
11. In accordance with the stipulation on file, the parties shall have joint legal custody of the minor child, Jonathan. Inasmuch as Jonathan is in a residential facility and neither with the plaintiff nor defendant, the court retains jurisdiction to decide all issues regarding physical custody and support of Jonathan, as necessary.
12. Each party shall be liable for, and shall indemnify the other against, any and all liabilities reflected on their respective financial affidavits, except (1) the debit balance in the Merrill Lynch money market account which shall be paid from the proceeds of the Merrill Lynch portfolio before its distribution to the parties, and (2) other than as may be set forth specifically in these orders.
13. The plaintiff shall maintain in force and effect, at his sole cost and expense, medical and health insurance for the minor child Jonathan, and for the defendant through and including December 31, 1996.
14. The plaintiff shall indemnify and hold the defendant harmless from any claim or loss in the nature of any tax, deficiency, interest, surcharge or penalty, of any kind whatsoever, relating to any joint tax return previously filed by the parties. The plaintiff shall promptly assume the defense of any such claim or loss, and if the plaintiff fails to do so, the plaintiff shall indemnify the defendant additionally, for the cost of defending against such claim or loss, including reasonable attorneys and expert fees.
15. No alimony is awarded to either party.
16. The plaintiff is ordered to pay $40,000 to the defendant as an allowance to defend this action no later than September 30, 1996. CT Page 5256-UU
17. Counsel for the plaintiff is ordered to prepare any and all documents required to effectuate the orders of this court, and to prepare the judgment file.
Dated at Stamford, Connecticut, this 14th day of August, 1996.
JOHN F. KAVANEWSKY, JR., JUDGE